IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHRISTOPHER WHITTAKER | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:26-CV-03427 |
| | § | |
| CITY OF MAGNOLIA, TEXAS AND | § | |
| MATTHEW "DOC" DANTZER, | § | |
| DEFENDANT. | § | JURY TRIAL DEMANDED |

## <u>PLAINTIFF'S FIRST AMENDED COMPLAINT</u>

Plaintiff, Christopher Whittaker ("Plaintiff" or "Mr. Whittaker"), hereby files this First Amended Complaint against Defendants City of Magnolia (the "City") and Matthew "Doc" Dantzer ("Mr. Dantzer") (collectively, the "Defendants") and would respectfully show the Court as follows:

### I. PARTIES

1.      Christopher Whittaker is an individual resident of the State of Texas.

2.      The city is a municipal corporation organized under Texas law, and it may be served through its City Secretary or other authorized agent at 18111 Buddy Riley Blvd., Magnolia, Texas 77354, or wherever it may be found.

3.      Mr. Dantzer is and was at all relevant times the Mayor of the City. He is sued in his individual capacity and may be served at 18111 Buddy Riley Blvd., Magnolia, Texas 77354, or wherever he may be found.

### II. JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1

1331, as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because Plaintiff's claims against Defendants are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy.

5.      Venue is proper under 28 U.S.C. § 1391(b) because Mr. Dantzer resides, and the events giving rise to Plaintiff's claims against Defendants occurred, in Montgomery County, Texas, within the Southern District of Texas. This Court therefore has personal jurisdiction over the city, a Texas municipal corporation located within the Southern District of Texas, as well as Mr. Dantzer.

### III.  CONDITIONS PRECEDENT

6.      All conditions precedent have been performed or have occurred.

### IV.  FACTS

7.      Mr. Whittaker was a public employee who was first hired by the City in June 2025 in the role of City Administrator.

8.      From October 29 to October 31, 2025, Mr. Whittaker attended the Texas Municipal League's Annual Conference in Fort Worth, Texas, along with Mr. Dantzer, the City Human Resources Director, and the City Secretary.

9.      After dinner on the night of October 29, Mr. Dantzer offered to walk the City Secretary—who was five months pregnant at the time—back to the hotel while the others in attendance continued their night elsewhere, and the City Secretary accepted.

10.     The City Secretary later reported that Mr. Dantzer began to make inappropriate and sexualized statements to the City Secretary on the walk back, including by commenting on her loose pants (worn due to her pregnancy), and he then twice attempted to pull them down.

11. Fearful of Mr. Dantzer's position of authority over her, the City Secretary later reported that she remained calm and attempted to play this off as a joke. As they approached the hotel, however, the City Secretary later reported that Mr. Dantzer suddenly—and violently— grabbed the City Secretary, pinned her by her throat against a column, and made more inappropriate and sexually-charged statements to her.

12. The City Secretary later reported that she yelled out and managed to push Mr. Dantzer off, after which she attempted to regain her composure and retreated to her hotel room. Mr. Dantzer sent her a text message apologizing shortly thereafter.

13. The City Secretary reported this incident to the Human Resources Director, Kristy Powell ("Ms. Powell"), the morning after it occurred, and she then immediately reported the same to Plaintiff. Plaintiff advised Ms. Powell to make a report to the police.

14. Based on what the City Secretary reported, Plaintiff believed the mayor's conduct to be a violation of law and a serious violation of the City Secretary's rights, and he believed the City was obligated to investigate and address it. Shortly after the incident, Plaintiff also verbally reported the sexual harassment to the City Attorney.

15. Ms. Powell and the City Secretary then submitted formal, written reports regarding the October 29 incident containing explicit requests for whistleblower protection on November 4 and 5, respectively. Fully supportive, Plaintiff made these reports to the City Attorney.

16. While at the office, Plaintiff acted to ensure that the Mayor was not left alone with the City Secretary. The City Attorney instructed the Mayor that the Plaintiff would be included on communications between the Mayor and the City Secretary going forward, for the purpose of preventing any further misconduct. As a result, both the city and the Mayor were well aware that Plaintiff was actively working to oppose and prevent the Mayor's harassment of, and ongoing retaliation against, the City Secretary.

17. The City Attorney hired a "third-party" investigator to conduct an investigation into the October 29 incident.

18. No attempt was made by the "third-party investigator" to interview Plaintiff in connection with its investigation, despite Plaintiff indicating that he had information relevant to the investigation.

19. In December, Plaintiff requested a performance review from the City because his contract required one in November, which had not yet occurred. That review took place before the City Council in an executive session in mid-December, during which Plaintiff was told he was doing a great job, and that there were no areas in need of improvement.

20. When it became apparent to Plaintiff that the "third-party" investigation was inadequate and operated more as a means of protecting the City and the Mayor, than uncovering the truth, and as the City Secretary continued to experience a hostile work environment because of her report of sexual harassment by the Mayor, Plaintiff became aware that the City was only going to continue to enable Mr. Dantzer's unlawful conduct. Plaintiff escalated his efforts by reporting to outside authorities.

21. Reporting violations of law, including sexual assault, harassment, and ongoing retaliation by an elected official to outside law enforcement and other administrative agencies, was not among Plaintiff's job duties or responsibilities as City Administrator. While Plaintiff's job duties included handling employment procedures and employee grievances within the organization, they did not include reporting a sitting Mayor's violations of the law to external enforcement agencies. Moreover, the city specifically instructed the Plaintiff not to discuss the incident with *anyone*—an instruction wholly inconsistent with any contention that reporting the incident was among the Plaintiff's job responsibilities.

22.     On his own initiative as a private citizen, and not at the direction of the city, Plaintiff sent letters reporting the October 29 incident to the Texas Rangers, the Texas Workforce Commission, the Fort Worth Police Department, and the Texas Municipal League Intergovernmental Risk Pool. Making these reports to external agencies was not a part of Plaintiff's ordinary or day-to-day duties as City Administrator, and he had never made reports of this nature before. He also made these reports using his private contact information. Plaintiff's reports to those outside authorities were directed well beyond the City's internal chain of command.

23.     Plaintiff also spoke out about the Mayor's misconduct to various members of the community who worked closely with the Mayor, including a Montgomery County commissioner and a Texas state representative.

24.     On January 12, Plaintiff reported again, this time to the Texas Workforce Commission's Civil Rights Division, specifying continued retaliation against the City Secretary.

25.     Later that same day, Plaintiff emailed the Fort Worth Police again with a report of the alleged violation of law.

26.     Plaintiff also reported the Mayor's pattern of misconduct to the Mayor Pro Tem Jack Huitt ("Huitt"). Specifically, Plaintiff reported that the Mayor had targeted the City Secretary and the City HR Director for their reports against him. Plaintiff told Huitt that the Mayor had engaged in a pattern of misconduct and was manipulating the investigation behind the scenes.

27.     On the morning of January 27, Plaintiff sent an email to Mr. Dantzer, in his capacity as Mayor, and to all members of City Council, requesting whistleblower protection and informing them of his reports of the continued hostile work environment and bullying against the City Secretary, who was nearly eight months pregnant at the time. The email also informed the Mayor and the City that Plaintiff had requested an investigation by the Texas Municipal League Intergovernmental Risk Pool.

28.     Given the events of the preceding three months—the City Secretary's reports of the Mayor's assault; Plaintiff's reports to the City Attorney; the instruction that Plaintiff be included on communications with the Mayor to prevent further misconduct; Plaintiff's reports to numerous external agencies; Plaintiff speaking out to members of the community; and the City's own "independent" investigation into the incident—Plaintiff's email put the Mayor and the City on notice that he was speaking out on a matter of public concern. Defendants knew that Plaintiff was taking his reports of the Mayor's misconduct outside the City's internal structure. His email expressly requested an investigation by the TML IRP and invoked formal whistleblower protection, which under Texas law turns on reports made to outside law-enforcement authorities. Defendants thus understood that Plaintiff was reporting the Mayor's unlawful conduct externally and seeking outside investigation into that unlawful conduct.

29.     Within three hours of Plaintiff's email, the Chief of Police walked into Plaintiff's office and hand-delivered a letter signed by Mr. Dantzer, in his capacity as Mayor. In the letter, the Mayor stated, "Under my authority as mayor, I am placing you on immediate suspension from your duties as city administrator," and stated that he was taking that action "based upon the fact that, earlier today, you wrote an email to me, the mayor Pro Tem, city council, and the city attorney." The letter further disparaged Plaintiff for the "purely selfish reason of claiming you are a 'whistleblower.'"

30.     At no time was Plaintiff ever asked by the City or Mr. Dantzer to specify the issues he described in the email, nor was he asked when he became aware of those issues. Plaintiff was simply told to clean out his office.

31.     The next day, on January 28, the City Council and the Mayor convened to consider Plaintiff's employment. At the Mayor's request, the Council first met in a closed executive session. During that session, the Mayor discussed Plaintiff's employment with the Mayor Pro Tem and

other members of the City Council. Plaintiff was then brought in and terminated. At no point did any Council member ask Plaintiff about the issues identified in his suspension letter, about his external reports, or about his invocation of whistleblower protections.

32. While the City of Magnolia does not have a grievance or appeal policy, on April 28, 2026, Plaintiff submitted a grievance and appeal request to the City Attorney pursuant to Texas Government Code § 554.006.

33. Plaintiff engaged in protected speech when he verbally reported, and reported in writing, a formal complaint regarding the October 29 incident, in which Mr. Dantzer is alleged to have assaulted and sexually harassed the City Secretary.

34. Defendants retaliated against and discharged Mr. Whittaker because of his protected speech.

35. At the time of retaliatory discharge, Mr. Dantzer and the City Council for the City were acting under color of the laws and regulations of the City and the State of Texas.

36. The City Attorney was asked at a City Council meeting on March 10, 2026, about the City's handling of the October 29 incident. Eventually, the City Attorney publicly admitted that the "third-party" investigation was conducted to protect the City, rather than the City's employees—including, importantly, the City Secretary and the Plaintiff, and the other employees assisting her in her report and in her continued employment afterward.

37. Following an investigation by the Texas Rangers—the same authority to which Plaintiff reported—Mr. Dantzer was arrested and charged by the Tarrant County District Attorney's office with felony assault of a pregnant person and official oppression.[1] The conduct

---

[1] *See* Case No. 1915694 in the 297th District Court of Tarrant County, Texas; see also Magnolia mayor faces third federal lawsuit related to assault, retaliation allegations, Click2Houston (May 3, 2026), https://www.click2houston.com/news/local/2026/05/04/magnolia-mayor-faces-third-federal-lawsuit-related-to-sexual-assault-retaliation-allegations/ ("The allegations prompted an investigation by the Texas Rangers, which

Plaintiff reported was not, as the suspension letter suggested, speculative; it was serious conduct by a sitting mayor that has since resulted in criminal charges.

## V.  COUNT 1—42 U.S.C. § 1983:

### FIRST AMENDMENT RETALIATION AGAINST MR. DANTZER IN HIS INDIVIDUAL CAPACITY

38.  Plaintiff incorporates the preceding paragraphs as if set forth herein.

39.  At the time of and leading up to Plaintiff's discharge, he was acting as a private citizen speaking as to a matter of public concern. Plaintiff reported a sitting Mayor's sexual harassment of a pregnant subordinate and the City's ongoing retaliation against her to external authorities—including the Texas Rangers, the Fort Worth Police Department, and the Texas Workforce Commission. Reporting such conduct by an elected official to outside authorities was not a part of Plaintiff's ordinary job duties as City Administrator, and Plaintiff had been affirmatively instructed not to discuss the incident.

40.  Plaintiff's speech addressed matters of grave public concern—the alleged violation of law, including sexual harassment and assault by a sitting public official against an employee, and ongoing retaliation amounting to a hostile work environment in response to reports of the sexual harassment.

41.  Plaintiff's interest in his statements and formal reports of workplace violations and/or other illegal behavior outweighs any interest of the City in promoting the efficient operation and administration of government services.

42.  Mr. Dantzer was acting under color of state law in his capacity as mayor.

43.  Mr. Dantzer personally suspended Plaintiff. The suspension was an adverse employment action that Mr. Dantzer imposed by his own hand within his own asserted authority

---

ultimately led to Dantzer's indictment on charges including aggravated assault of a pregnant person and official oppression.").

as Mayor. Mr. Dantzer's suspension of Plaintiff was thus a direct, affirmative, and personally imposed retaliatory act, undertaken because of Plaintiff's protected speech.

44. The suspension and termination that followed would deter a person of ordinary firmness from continuing to engage in the protected speech.

45. Mr. Dantzer's retaliatory animus was also a link in the causal chain leading to Plaintiff's termination. In the suspension letter, Mr. Dantzer affirmatively stated that the suspension was "pending further potential action by City Council," and that he "may ask council to continue [Plaintiff's] suspension." By initiating the suspension and referring the issues to the City Council with his stated reservations about Plaintiff's continued employment, Mr. Dantzer conveyed to the City Council his position that adverse action against Plaintiff was warranted. That Mr. Dantzer's intervention influenced the City Council's decision is reinforced by the fact that only a month earlier, the same City Council had reviewed Plaintiff's performance and found he was doing a great job with no areas of improvement. Nothing material changed in the interim except Plaintiff's protected speech and Mr. Dantzer's retaliatory response to it. Therefore, Mr. Dantzer initiated and set in motion the process that culminated in Plaintiff's termination the following day. Mr. Dantzer participated in and influenced the City Council's consideration of Plaintiff's employment.

46. At the time of Mr. Dantzer's conduct in January 2026, it was clearly established that a public employee has a First Amendment right to be free from retaliation for speaking as a private citizen on a matter of public concern, including for reporting a public official's sexual harassment and ongoing retaliation based on the complaints of sexual harassment to outside law enforcement and other agencies.

47. Plaintiff's protected activity was not limited to his January 27 email; it included reports of the Mayor's violations of law to external law enforcement authorities—reports made

outside of the City's chain of command and which Plaintiff had been instructed not to make. Moreover, the January 27 email put the Defendants on notice that Plaintiff was acting beyond his job duties by invoking whistleblower protection and informing them that he had requested an investigation by the Texas Municipal League. The email reflected that Plaintiff was reporting the Mayor's misconduct externally, rather than merely performing his administrative duties.

48. Mr. Dantzer's conduct was objectively unreasonable. No reasonable official could have believed it lawful to suspend an employee and set in motion his termination within hours of that employee's external reports of violations of law and invocation of whistleblower protection. The rationale stated in the letter—that Plaintiff had raised the issues too late and in too vague a manner—is facially pretextual because the City had told Plaintiff only a month earlier that his performance was excellent, and neither the City nor Mr. Dantzer ever asked Plaintiff to clarify the issues he raised.

49. The City also acted with knowledge of Plaintiff's protected speech. As confirmed by Mr. Dantzer's suspension letter, Plaintiff's January 27 email included City Council, and the Council terminated Plaintiff the following day. The Council's decision to terminate cannot be an independent action taken for reasons unrelated to Plaintiff's protected speech or Mr. Dantzer's retaliatory suspension.

50. Plaintiff's protected speech was a substantial and motivating factor in, and a but-for cause of, Mr. Danzer's decision to suspend Plaintiff and the adverse actions that followed. The suspension came within hours of the email and, by the letter's own terms, was taken because of that email.

51. Furthermore, Mr. Dantzer acted willfully, deliberately, maliciously, or with reckless disregard for Plaintiff's right to free speech protected under the First Amendment.

52.	Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of Mr. Dantzer's illegal actions and Plaintiff's discharge in violation of 42 U.S.C. § 1983.

### VI.  COUNT 2—42 U.S.C. § 1983:
### *MONELL* LIABILITY AGAINST THE CITY

53.	Plaintiff incorporates the preceding paragraphs as if set forth herein.

54.	The violation of Plaintiff's constitutional rights was caused by an official policy or custom that was promulgated, made, or ratified by the City's final policymaker. The identity of the final policymaker with respect to the specific actions at issue is a question of law for the Court to determine.

55.	The City Council terminated Plaintiff's employment at its meeting on January 28, 2026. The City Council is the City's final policymaker with respect to the termination of Plaintiff's employment because the City Council makes the final decision with respect to the removal of municipal officers and employees. Alternatively, to the extent the Mayor exercised final policymaking authority over personnel and employee-protection practices, the Mayor was the *de facto* final policymaker with respect to enforcing the City's custom of ignoring, ratifying, and enabling the Mayor's unlawful behavior.

56.	The City's decision to terminate Plaintiff in retaliation for exercising his constitutional rights constitutes an act of official municipal policy. The policy was the moving force behind the violation of Plaintiff's unconstitutional rights. The City made the decision with knowledge of Plaintiff's protected activity and for a retaliatory purpose.  The City and the Mayor knew that Plaintiff was actively opposing the unlawful conduct and serving as an intermediary between the City Secretary and the Mayor during the period of ongoing harassment and hostile work environment. Plaintiff's January 27 email—invoking whistleblower protection for reporting

11

the continuing hostile work environment and requesting an outside agency investigate—was sent directly to the City Council. The City Council terminated Plaintiff the very next day.

57.     The temporal proximity of the termination demonstrates the causal link. Additionally, the City Council's decision to terminate Plaintiff was not an independent action taken for reasons unrelated to Plaintiff's protected activity and was not the product of any intervening, lawful, and independent cause. Indeed, the City Council created a sham questioning session to manufacture a pretextual performance issue—one that is directly contradicted by his positive performance evaluation from the month prior. Additionally, the stated reason for Plaintiff's pre-termination suspension—that Plaintiff failed to timely notify the Mayor of important potential issues with enough detail—is contradicted by the fact that the City did not ask Plaintiff about *any* details of any issues he raised.

58.     The City acted with direct, contemporaneous knowledge of Plaintiff's protected activity.   Therefore, the termination was unconstitutional or was decided with deliberate indifference to the known or obvious fact that a constitutional violation would follow.

59.     Additionally, the City maintained a custom and practice of protecting Mr. Dantzer from the consequences of his misconduct, including ongoing retaliation against employees who reported the misconduct. The City's policy or custom enabled its agents and employees, including Mr. Dantzer, to act with deliberate indifference to Plaintiff's right to free speech.

60.     This custom is evidenced by the City's pattern of conduct towards multiple employees who reported or opposed Mr. Dantzer's misconduct, including the City Secretary, the Human Resources Director, and Plaintiff. It is further evidenced by the City's commissioning of a "third-party" investigation that failed to even interview Plaintiff, who had relevant information, and that was admittedly directed at protecting the City rather than uncovering the truth.

61. The series of events demonstrates that this custom was the moving force behind the violation of Plaintiff's constitutional rights. Acting in accordance with this custom, the City and its officials retaliated against Plaintiff for reporting and opposing Mr. Dantzer's misconduct.

62. In the alternative, to the extent the decision to terminate Plaintiff is attributed to Mr. Dantzer rather than to the City Council directly, the City Council ratified that decision and the retaliatory basis for it. The City likewise ratified Mr. Dantzer's decision to suspend Plaintiff and approved and gave effect to the retaliatory action by the Mayor by terminating Plaintiff without even further investigating the alleged reason for the suspension.

63. As a direct and proximate result of the City's conduct, Plaintiff has suffered damages, including lost wages.

64. Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of the City's illegal actions and Plaintiff's discharge in violation of 42 U.S.C. § 1983.

## VII. COUNT 3—RETALIATION IN VIOLATION OF THE TEXAS WHISTLEBLOWER ACT AGAINST THE CITY

65. Plaintiff incorporates the preceding paragraphs as if set forth herein.

66. Plaintiff reported a violation of law by Mr. Dantzer, a public employee, and the City's chief executive officer, to the City and other appropriate law enforcement authorities.

67. Plaintiff's numerous reports regarding Mr. Dantzer's violation of law were made in good faith and conduct that he believed to be a violation of law.

68. The City was aware that Plaintiff had reported a violation of law and that he specifically requested whistleblower protection. Nonetheless, the City terminated Plaintiff's employment the next day.

69. Plaintiff's discharge would not have occurred if Plaintiff had not reported the illegal conduct and, thereafter, been subjected to retaliation.

70. Plaintiff timely initiated the grievance or appeal procedures as required by Texas Government Code § 554.006.

71. Plaintiff is entitled to and seeks damages in an amount to be determined at trial, as well as attorneys' fees, costs, and pre- and post-judgment interest, as a result of the City's illegal actions and Plaintiff's discharge in violation of the Act.

## VIII.  DAMAGES

72. Plaintiff incorporates the preceding paragraphs as if set forth herein.

73. As a direct and proximate cause of Defendants' actions, Plaintiff suffered the following injuries and damages:

      a.     Lost earnings;

      b.     Loss of earning capacity;

      c.     Damage to reputation in the past and future;

      d.     Mental anguish in the past and future; and

      e.     Loss of pension or retirement benefits.

## IX.  ATTORNEYS' FEES & COSTS

74. Plaintiff is entitled to an award of attorneys' fees and costs, including without limitation expert fees, under 42 U.S.C. § 1988(b)-(c) and Texas Government Code § 554.003(a).

## X.  DEMAND FOR JURY TRIAL

75. Plaintiff demands a trial by jury in this action.

## XI.  CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests judgment in

his favor against all Defendants, jointly and severally, as follows:

    a.    Actual and/or compensatory damages;

    b.    Punitive damages;

    c.    Pre- and post-judgment interest;

    d.    Plaintiff's costs of suit and reasonable attorneys' fees; and

    e.    Such additional or alternative relief as the Court deems just and proper.

Respectfully Submitted,

**The Atlas Law Firm, PLLC**

By: */s/ Billy Robinett*
**Billy Robinett** (attorney-in-charge)
Texas Bar No. 24124176
Federal Bar No. 3633010
**Shelby Payne**
Texas Bar No. 24131576
Federal Bar No. 3761733
11767 Katy Fwy, Suite 1100
Houston, Texas 77079
Telephone: (832) 225-8353
Facsimile: (888) 861-1304
billy@atlasfirm.law
shelby@atlasfirm.law

**Attorneys for Plaintiff**

# CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on all counsel of record via the Court's ECF system on June 23, 2026.


*/s/ Billy Robinett*
**Billy Robinett**